## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| D.S., *on behalf of herself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> Tallahassee Memorial HealthCare, <br><br> Defendant. | Case No. _____ <br><br> **JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff D.S., at all times relevant herein, has been a patient of Tallahassee Memorial HealthCare ("TMH" or "Defendant"), a healthcare system operating Tallahassee Memorial Hospital. Plaintiff brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

1.    Plaintiff brings this case to address Defendant's unlawful practice of disclosing its patients confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private

1

Information") to unauthorized third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook") and Google LLC ("Google"), without consent, through the use of tracking software that is embedded in Defendant's website.

2.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of such information can have serious consequences, including discrimination in the workplace or denial of insurance coverage.

3.    Defendant owns and controls https://www.tmh.org ("Defendant's Website" or the "Website"), which it encourages patients to use for: (1) finding treatments options and services it provides; (2) searching for and identifying specific physicians and other care providers based on specific medical symptoms, conditions, specialties and desired treatments; (3) booking medical appointments with those physicians; (4) finding additional information about their specific physicians, including office locations, phone number, testing facilities, and more; (5) accessing medical records and information related to insurance coverage, medical bills, financial assistance, and more; and (6) signing up for classes.  booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and classes, and more.

2

4.     Unbeknownst to its patients, Defendant installed tracking technologies ("Tracking Tools") onto its Website, including Meta Platforms, Inc.'s Tracking Pixel (the "Meta Pixel" or "Pixel") and Google, LLC's Google Analytics tool, which allow unauthorized third parties to intercept the contents of patients' communications, receive and view patients' Private Information, mine it for purposes unrelated to the provision of healthcare, and further monetize it in the form of targeted advertisements.

5.     In doing so, and by designing its Website in the manner described herein, Defendant knew or should have known that its patients would use the Website to communicate Private Information in conjunction with obtaining and receiving medical services from it.

6.     Plaintiff and other Class Members reasonably believed they were communicating only with their trusted healthcare provider when they used the Website to submit information related to their past, present, or future health conditions, and nothing about the Website's appearance indicated that unauthorized third parties like Facebook and Google would  receive the confidential information they communicated via the Website.

7.     The information collected and disclosed by Defendant's Tracking Tools is not anonymous. For example, Facebook connected user data from Defendant's Website to patients' Facebook IDs ("FID"), thereby linking individual

patients' specific communications to their unique Facebook profiles for future use and exploitation.

8.      Similarly, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[1]

9.      Such Private Information allowed Facebook and Google to learn that a specific patient was seeking confidential medical care from Defendant, as well as the type of medical care being sought, specific medical conditions, and other sensitive details.

10.     Simply put, the health information disclosed through the Tracking Tools is personally identifiable, not anonymous.

---

[1] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 29, 2023) ("Such PHI may include, for example, an individual's IP address . . .").

11.    Defendant is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

12.    In addition, as explained further below, HHS has specifically warned that tracking technologies like those used by Defendant transmit patients' personally identifying information to third parties on both public-facing webpages and within password-protected patient portals, and that such information should not be transmitted without a HIPAA-acceptable written authorization from patients.

13.    The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

14.    In addition, Florida State Law per the Florida Security of Communications Act, Florida Statutes § 934.01, *et seq*. and the Florida Constitution protects the privacy of innocent persons.

15.    Despite these clear laws and regulations, Defendant embedded the hidden Tracking Tools on its Website, essentially planting a bug on patients' web browsers that forced the disclosure of their private and confidential communications with Defendant to third parties. TMH's utilization of the Tracking Tools to secretly track and share with third parties its patients' communications on its Website is the electronic equivalent of looking over the shoulder of each visitor for the entire duration of their Website interaction. Defendant did not disclose the presence of these Tracking Tools to its patients and Website users.

16.    Healthcare patients simply do not anticipate or expect that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party – let alone Facebook and Google, which both have a sordid history of privacy violations in pursuit of ever-increasing advertising revenue.

17.    Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or Google.

6

18.    Moreover, Defendant does not have HIPAA-compliant business associate agreements with Facebook or Google—i.e. they are not authorized to receive patients' PII or PHI.

19.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, inter alia,: (i) failing to remove or disengage technology that was known and designed to share web-users' information; (ii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook, Google, and others; (iii) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools like the Facebook Pixel or Google Analytics; (iv) failing to warn Plaintiff and Class Members; and (v) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patients' communications and Private Information.

20.    As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of their Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

21.    Plaintiff seeks to remedy these harms and brings causes of action for (1) violation of the Florida Security of Communications Act, § 934.01 *et seq*., Fla Stat. ("FSCA"); (2) invasion of privacy under Florida's Constitution; (3) invasion of

privacy; (4) breach of implied contract; (5) unjust enrichment; (6) violations of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) - unauthorized interception, use, and disclosure; and (7) breach of confidence.

## PARTIES

22.    Plaintiff D.S. is a natural person and citizen of Florida where she intends to remain.

23.    Plaintiff D.S. provided her Private Information to TMH as a patient seeking medical care, and she used its Website to communicate that information, on the condition that it would be kept confidential and not disclosed to any unauthorized third parties.

24.    Defendant Tallahassee Memorial HealthCare is a healthcare provider that serves northern Florida and southern Georgia, with its principal place of business located at 1300 Miccosukee Road in Tallahassee, Florida.[2]

25.    Founded in 1948, Tallahassee operates facilities covering a 21-county region in Florida and Georgia, a 772-bed acute care hospital, a surgery and adult ICU center, a psychiatric hospital, multiple specialty care centers and thirty-eight

---

[2] https://www.tmh.org/find-a-location/location-results?LocationTypeId=3

8

affiliated physician practices, as well as collaborative partnerships with other regional healthcare providers and facilities. [3]

26.    Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION & VENUE

27.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

28.    This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq.*, and 18 U.S.C. § 2702).

29.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

---

[3] *Id.*

30.    Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District and a substantial portion of the acts and omissions giving rise to her claims occurred in this District.

**COMMON FACTUAL ALLEGATIONS**

**A. The U.S. Department of Health and Human Services and Federal Trade Commission Have Warned about Use of Tracking Tools by Healthcare Providers**

31.    In January 2013, HHS issued a final rulemaking notice regarding modifications to the HIPAA privacy, security, enforcement, and breach notification rules under the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") to "strengthen the privacy and security protection for individuals' health information." 78 Fed. Reg. 5566 (January 25, 2013).

32.    As part of that final rulemaking, which became effective on March 26, 2013, HHS stated that, to be considered protected health information (PHI) under HIPAA, information did "not necessarily [need to] include diagnosis-specific information, such as information about the treatment of an individual." 78 Fed. Reg. at 5598. Instead, "[i]f the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules." *Id.*

33.    In December 2022, HHS issued a bulletin (the "HHS Bulletin")

warning regulated entities like Defendant about the risks presented by the use of

Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[4]

In other words, the HHS has expressly stated that entities like Defendant that

implement the Facebook Pixel and Google Analytics and disclose patient

information have violated HIPAA Rules unless those entities obtain a HIPAA-

complaint authorization.

34.    The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[5]

---

[4] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 18, 2023) (emphasis added).

[5] *Id.*

35.    Additionally, HHS has warned healthcare providers that Protected Information is not limited exclusively to patient portals like MyChart, and thus Defendant still has an obligation to protect information on non-password protected (i.e., "unauthenticated") webpages. Citing to the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)...relates to the individual's past, present, or future health or health care or payment for care."[6]

36.    The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. ***For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.***[7]

37.    In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Defendant to stop using Tracking Tools:

---

[7] *Id.* (emphasis added)

If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[8]

## B. Underlying Web Technology

38.    To understand Defendant's unlawful data-sharing practices, it is important first to understand basic web design and tracking tools.

39.    Devices (such as computer, tablet, or smart phone) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

---

[8] *Re: Use of Online Tracking Technologies*, U.S. Dept. of Health & Hum. Servs. and Fed. Trade. Comm'n (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

40.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

41.     Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[9]

42.    Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

43.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Pixels are embedded in the Source Code and instruct the Website to send a second set transmissions to the third party's servers, i.e., Facebook and Google.

44.    By contrast, the Markup is the façade of the Website - what the user sees.

45.    When a patient uses the Website, their HTTP Request seeks specific information (e.g., the "Find a Doctor" page), and the HTTP Response provides the

---

[9] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

requested information in the form of "Markup" which comprises the webpage's content and features.



*Figure 1. The image above is a screenshot taken from the user's web browser upon using tmh.org/find-a-doctor/ and typing "testicular cancer" into the treatment request box.*

46.    The image above is a screenshot taken from a user's browser upon visiting www.tmh.org and selecting the "Find a Doctor" button.

47.    Upon doing this, the patient's browser automatically sends an HTTP Request to Defendant's web server, which automatically returns an HTTP Response and loads the Markup for that webpage.

48.    As depicted above, the user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses, and there's no visible indication that their communications are being transmitted to third parties via the Tracking Tools.

## C. Tracking Tools

49.    Third parties, like Facebook, offer Tracking Tools as software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms. The Tracking Tools are used to gather, identify, target, and market products and services to individuals.

50.    In general, Tracking Tools are offered to entities like Defendant for "free." In fact, however, they are bartered in exchange for Defendant's patients' data.

51.    The Tracking Tools are used to gather, identify, target, and market products and services to Defendant's patients.  Advertisers, such as Defendant, can track other user actions and communications and can create their own tracking parameters by customizing the software on their website.

52.    When a user accesses a webpage that is hosting Tracking Tools, the user's communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party. For example, the Facebook

Pixel on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of their communications with the Website and send the duplicate from the user's browser directly to Facebook's server.

53.    Google Analytics is marginally different than the Facebook Pixel, but essentially accomplishes the same goal; tracking what a user communicates to Defendant's website.[10]

54.    Notably, these transmissions only occur on webpages that contain Tracking Tools. Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook or Google via this technology or the Website but for Defendant's decision to install and use the Tracking Tools.

55.    If a particularly tech-savvy user attempts to circumvent browser-based wiretap technology, their communications via the Website may nonetheless be transmitted to Facebook via first-party cookies and server-to-server transmissions. Users cannot detect or prevent these server-to-server transmissions, nor can they block first-party cookies.

56.    Marketers are aware of this and Conversions API ("CAPI) is a Facebook Business tools that was created for this exact purpose, functioning as a redundant measure to circumvent any ad blockers or other denials of consent by

transmitting information directly from Defendant's servers to Facebook's servers.[11,12]

57.    Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[13]

58.    The third parties to whom a website transmits data through Tracking Tools and associated workarounds, e.g. CAPI, do not provide any substantive Website content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to bolster profits).

59.    Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer the user's

---

[11]*What is the Facebook Conversions API and how to use it*, Realbot (last updated May 20, 2022), https://revealbot.com/blog/facebook-conversions-api/ (last visited Jan. 24, 2023).

[12] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Jan. 27, 2023).

[13]*About Conversions API*, Meta Business Help Center, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Jan. 28, 2023).

computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

### D. Defendant Disclosed Plaintiff's and Class Members' Private Information to Facebook and Google Using Tracking Tools

60. In this case, Defendant employed Tracking Tools, including the Facebook Pixel and Conversions API, as well as the Google Analytics tool, to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook and Google.

61. Defendant's Source Code manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Facebook and Google. These transmissions occurred contemporaneously, invisibly, and without the patient's knowledge.

62. Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Facebook, Google, and other third parties to listen in on all the contents of their highly sensitive communications with Defendant and thereby intercept those communications, including Private Information and not merely meta-data or time stamps.

63.    The Tracking Tools allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Website does not rely on the Tracking Tools in order to function.

64.    While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

65.    Plaintiff and Class Members were not aware that their Private Information would be shared with third parties as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

66.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

67.    Defendant's Tracking Tools sent non-public Private Information to third parties like Facebook and Google, including but not limited to Plaintiff's and Class Members': (1) the sought medical treatment; (2) appointment type; (3) the selected physician's name and specialty; (4) specific button/menu selections; (5) particular symptoms, conditions, and treatments that were typed into free text boxes; and (6) demographic information.

68.    Importantly, Defendant transmitted this Private Information alongside its patients' personally identifying information, which allowed the third-party recipient to connect the Private Information to specific patients.

69.    For example, the Private Information sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and specific identity.[14]

70.    A user's FID is linked to their Facebook profile, which generally contains a wide range of demographics and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

---

[14] Defendant's Website track and transmit data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

71.    Similarly, Google users who are logged-in to their Google accounts also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.[15]

72.    Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to unauthorized third parties; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

73.    By installing and implementing both Facebook tools and Google Analytics, Defendant caused Plaintiff's and Class Member's communications to be intercepted by and/or disclosed to Facebook and Google and for those communications to be personally identifiable.

74.    As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

**E. Defendant's Tracking Tools Disseminate Patient Information Via Its Website**

75.    For example, if a patient used tmh.org to book an appointment with a urologist, the Website directed them to communicate Private Information via search bars and filtering features.

76.    In the image below, the user searched for a physician specialized in treating "testicular cancer" who identifies as "Male," is within 5 miles of the "32308" zip code or "Tallahassee, FL," and is specialized in the field of Urology.



*Figure 2. Screenshot taken from tmh.org in which the user typed "testicular cancer"
into the search bar and narrowed their search results by applying the following
filters: "within 5 miles" of "32308," "Male," "Tallahassee, FL," and "Urology"
in order to narrow their search results.*

77.    Unbeknownst to ordinary patients, this particular webpage—which is

undoubtedly used to communicate Private Information for the purpose of seeking

medical treatment—contains Defendant's Pixel.

78.    The image below shows the "behind the scenes" portion of the website that is invisible to ordinary users, and each entry in the column to the right represents just one instance in which Defendant's Pixel sent the user's information to Facebook.



*Figure 3. Screenshot taken from tmh.org which shows the mark-up (user-facing portion of the website) alongside the source code. Each entry in the column to the right represents one instance in which the user's information was transmitted to Facebook via Defendant's pixel.*

79.    Thus, without alerting the user, the Website sent each and every communication the user made via this webpage to Facebook, and the images below

confirm that the communications Defendant sends to Facebook contain the user's

Private Information.



80.

*Figure 4. Image taken during a browsing session wherein the user sought a physician specialized in Urology.*

81.    The user continues their browsing session by clicking the "Request an

Appointment" button shown in dark blue in Figure 4.

82.    Upon making this selection, their information is sent to Facebook, and

Figure 5 below demonstrates that it includes the contents of their communications.



*Figures 5. Screenshot taken from user's network traffic report during their physician search and a screenshot of the user's network traffic depicting the user's URL Request headers associated with Defendant's Pixel ID: 457104899562880.*

83.    The first line of highlighted text, "tr/?id=457104899562880," refers to Defendant's Pixel ID and confirms it installed the Pixel into its Source Code for this webpage.

84.    The second line of text, "ev: SubscribedButtonClick," identifies and categorizes which actions the user took on the Webpage ("ev:" is an abbreviation for event, and "SubscribedButtonClick" is the type of event). Thus, this identifies the user as having viewed the particular webpage after applying their search criteria, and it also identifies them as having clicked the "Request an appointment."

85.    The next lines of highlighted text show Defendant has disclosed to Facebook that the user: (1) is a patient seeking medical care from Defendant via tmh.org; (2) in conjunction with a specific medical condition (highlighted above as "testicular cancer"); and (3) is in the process of booking an appointment or searching for a particular physician ("find-a-doctor") based in "Tallahassee."

86.    Finally, the highlighted text ("GET") combined with the user's Facebook ID (highlighted as "c_user=" in the image above) demonstrates that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user ID), thereby allowing

the user's communications and actions on the website to be linked to their specific Facebook profile.[16]

87.    Defendant's pixel also tracks and records instances in which a patient or prospective patient has called or attempted to call their physician's phone number from the website in conjunction with their scheduling request. For example, the image below shows the information Defendant communicates to Facebook when a user attempts to call Dr. Scott Sellinger's office by clicking the link on his physician profile page.



*Figure 6. Screenshot taken when user searches for a particular physician's phone number and then attempts to call that number.*

---

[16] The user's Facebook ID is represented as the c_user ID highlight in the image above, and Plaintiff has redacted the corresponding string of numbers to preserve the user's anonymity.

88.    Resultantly, that exact phrase is sent to Facebook, thereby allowing the user's medical condition to be linked to their individual Facebook account for future retargeting and exploitation. This is simply unacceptable, and there is no legitimate reason for sending this information to Facebook.



*Figure 7. Screenshot taken from the user's traffic report depicting the "Payload" and corresponding "Headers" associated with the user's online activity and communications to Defendant.*

89.     As with the previous example, the user's search parameters and filters are communicated to Facebook via Defendant's pixel, and their phone call (or attempted phone call) is recorded as a "SubscribedButtonClick."

90.     To make matters worse, Defendant's Pixel even tracks and records the exact text and phrases typed into the general search bar on tmh.org.

**Search by Keyword or Phrase**

i have dementia                    **Q Search Again**

*Figure 8. Screenshot of user's search for "I have dementia" through the Defendant's search box.*

91.     If a patient typed "I have dementia" into the search bar, that exact phrase was sent to Facebook, thereby linking the user's specific medical condition to their individual Facebook account for future retargeting and exploitation. This is simply unacceptable, and there is no legitimate reason for sending this information to Facebook.



× Headers    Payload    Preview    Response    Initiator    Timing    Cookies

▼ Query String Parameters        view source        view URL-encoded

id: 457104899562880

ev: Microdata

dl: https://www.tmh.org/site-search/?q=I%20have%20dementia

rl: https://www.tmh.org/health-and-wellness/events/event-cart?occurrenceId=680&isRegister=true

if: false

ts: 1677281444350

cd[DataLayer]: []

cd[Meta]: {"title":"Site Search Tallahassee, Florida (FL), Tallahassee Memorial HealthCare"}

cd[OpenGraph]:    {"og:title":"Site Search Tallahassee, Florida (FL), Tallahassee Memorial HealthCare","og:ur
l":"https://www.tmh.org/site-search/","og:locale":"en_US","og:site_name":"Tallahassee Memorial
HealthCare"}

▼ Request Headers

:authority: www.facebook.com

:method: GET

:path: /tr/?id=457104899562880&ev=Microdata&dl=https%3A%2F%2Fwww.tmh.org%2Fsite-search%2F%3Fq%3DI%252
0have%2520dementia&rl=https%3A%2F%2Fwww.tmh.org%2Fhealth-and-wellness%2Fevents%2Fevent-cart%3Foccurr
enceId%3D680%26isRegister%3Dtrue&if=false&ts=1677281444350&cd[DataLayer]=%5B%5D&cd[Meta]=%7B%22titl
e%22%3A%22Site%20Search%20Tallahassee%2C%20Florida%20(FL)%2C%20Tallahassee%20Memorial%20HealthCare%2
2%7D&cd[OpenGraph]=%7B%22og%3Atitle%22%3A%22Site%20Search%20Tallahassee%2C%20Florida%20(FL)%2C%20Tal
lahassee%20Memorial%20HealthCare%22%2C%22og%3Aurl%22%3A%22https%3A%2F%2Fwww.tmh.org%2Fsite-search%2
F%22%2C%22og%3Alocale%22%3A%22en_US%22%2C%22og%3Asite_name%22%3A%22Tallahassee%20Memorial%20HealthCa
re%22%7D&cd[Schema.org]=%5B%7B%22dimensions%22%3A%7B%22h%22%3A969%2C%22w%22%3A1020%7D%2C%22propertie
s%22%3A%7B%22name%22%3A%22Tallahassee%20Memorial%20HealthCare%22%2C%22url%22%3A%22%2F%22%2C%22logo%2
2%3A%22%2Fassets%2Fimages%2Flogo-vert-pos.svg%22%7D%2C%22subscopes%22%3A%5B%5D%2C%22type%22%3A%22htt
p%3A%2F%2Fschema.org%2FMedicalOrganization%22%7D%5D&cd[JSON-LD]=%5B%7B%22%40context%22%3A%22http%3A%
2F%2Fschema.org%22%2C%22%40type%22%3A%22BreadcrumbList%22%2C%22itemListElement%22%3A%5B%7B%22%40typ
e%22%3A%22ListItem%22%2C%22position%22%3A1%2C%22item%22%3A%7B%22%40id%22%3A%22http%3A%2F%2Fwww.tmh.o
rg%2F%22%2C%22name%22%3A%22Home%22%7D%7D%2C%7B%22%40type%22%3A%22ListItem%22%2C%22position%22%3A2%2
C%22item%22%3A%7B%22%40id%22%3A%22http%3A%2F%2Fwww.tmh.org%2Fsite-search%2F%22%2C%22name%22%3A%22Sit
e%20Search%22%7D%7D%5D%7D%5D&sw=1920&sh=1080&v=2.9.97&r=stable&ec=1&o=30&fbp=fb.1.1677281096124.4196
0516&it=1677281443775&coo=false&es=automatic&tm=3&rqm=GET

:scheme: https

accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9

cookie: sb=VrLBY5y36a3RDUuvDZHMHwFK; datr=VrLBYwe38VyhLPXyBwHdGCHz; c_user=          xs=16%3Adc-Omv
jWvJCxQw%3A2%3A1673890850%3A-1%3A2663%3A%3A4AcXT-b0D8pSknXzTbqrLu6AWiLQikeY4FJ5vjr9gcoo; fr=0JqUksNd1
LHSOa1xC.AWUiyN9C8AP0WsGsuUDauUJVnWo.Bj-M94.IK.AAA.0.0.Bj-M94.AWXyiYwxgGY

referer: https://www.tmh.org/

sec-ch-ua: "Not_A Brand";v="99", "Google Chrome";v="109", "Chromium";v="109"

*Figures 9 and 10.. Screenshot of user's network traffic report depicting the "Payload" and corresponding "Headers" associated with the user's online activity and communications to Defendant.*

92.    In each of the examples above, the user's website activity and the contents of the user's communications are sent to Facebook alongside their personally identifiable information. Several different methods allow marketers and third parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into Facebook on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

93.    Facebook receives at least five cookies when Defendant's website transmits information via the Pixel**:**

```
  "cookies": [
    {
      "name": "sb",
      "value": "VrLBY5y36a3RDUuvDZHMHwFK",
      "path": "/",
      "domain": ".facebook.com",
      "expires": "2024-02-20T17:40:51.490Z",
      "httpOnly": true,
      "secure": true,
      "sameSite": "None"
    },
    {
      "name": "datr",
      "value": "VrLBYwe38VyhLPXyBwHdGCHz",
      "path": "/",
      "domain": ".facebook.com",
      "expires": "2024-02-17T19:34:47.887Z",
      "httpOnly": true,
      "secure": true,
      "sameSite": "None"
    },
    {
      "name": "c_user",
      "value": "1505700116",
      "path": "/",
      "domain": ".facebook.com",
      "expires": "2024-02-24T14:53:42.881Z",
      "httpOnly": false,
      "secure": true,
      "sameSite": "None"
    },
    {
      "name": "xs",
      "value": "16%3Adc-OmvjWvJCxQw%3A2%3A1673890850%3A-1%3A2663%3A%3AAcXT-nXzTbqrLu6AWiLQikeY4FJ5vjr9gcoo",
      "path": "/",
      "domain": ".facebook.com",
      "expires": "2024-02-24T14:53:42.881Z",
      "httpOnly": true,
      "secure": true,
      "sameSite": "None"
    },
    {
      "name": "fr",
      "value": "0JqUksNd1LHSOalxC.AWUiyN9CBAP0WsGsuUDauUJVnWo.Bj-M94.IK.AAA.0.0.Bj-yiYwxqGY",
      "path": "/",
      "domain": ".facebook.com",
      "expires": "2023-05-25T14:53:40.881Z",
      "httpOnly": true,
      "secure": true,
      "sameSite": "None"
```

*Figure 11. Screenshot from the .har file pulled from the Defendant's website depicting the 5 active cookies from Facebook, "sb", "datr", "c_user", "xs", and "fr" cookies.*

94.    The cookies listed in the image above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the way individual website users were identified via these cookies, and Facebook would not have

received this data but for Defendant's implementation and use of the Pixel throughout its website.

95.    Defendant also revealed its website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user:[17]

*Figure 12.  Screenshot from the .har file pulled from the Defendant's website depicting the _fbp cookie which appears 369 times after one search on the Defendant's site.*

96.    Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie— i.e. a cookie that was created and placed on the website by Defendant.[18]

97.    The Facebook Tracking Pixel uses both first- and third-party cookies.

98.    In summation, Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically

---

[17] *Id.*

[18] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

99.    At present, the full breadth of Defendant's tracking and data sharing practices is unclear, but other evidence suggests Defendant is using additional Tracking Tools to transmit its patients' Private Information to additional third parties. For example, the image below indicates that Defendant is also sending its patients' protected health information to Google via Google Tag Manager.

100.    The image below contains the content of the user's communication typed into the search bar, "I have dementia", and Defendant does not appear to have enabled the anonymize feature provided by Google Analytics because the text "aip:" does not appear in the image.



▼ Request Headers

:authority: analytics.google.com

:method: POST

:path: /g/collect?v=2&tid=G-LDLR5M74HV&gtm=45je3310&_p=1099968096&cid=734040496.1677281
096&ul=en-us&sr=1920x1080&uaa=x86&uab=64&uafvl=Not_A%2520Brand%3B99.0.0.0%7CGoogle%252
0Chrome%3B109.0.5414.120%7CChromium%3B109.0.5414.120&uamb=0&uam=&uap=Windows&uapv=10.
0.0&uaw=1&sid=1677796824&sct=2&seg=1&dl=https%3A%2F%2Fwww.tmh.org%2F?site-search%2F%3F
q%3DI%2520have%2520dementia&dr=https%3A%2F%2Fwww.tmh.org%2Fprovider%2Fscott-sellinger-
md-urology&dt=Site%20Search%20Tallahassee%2C%20Florida%20(FL)%2C%20Tallahassee%20Memor
ial%20HealthCare&_s=1

:scheme: https

accept: */*

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9

content-length: 94

content-type: text/plain;charset=UTF-8

cookie: __Secure-3PAPISID=q_7iAYLBHcbolVXq/Awb2MsAUGsVzJ_SpI; __Secure-3PSID=Twi33iuRyt
2Kitg2iJHGxPYukZ_bD_zZN9whZgw7gMSzgB0_6vrTGine1kGJAaEoQl4Zvw.; __Secure-3PSIDCC=AFvIBn
_df8t6KvWdCKml6yDWlhVDI-RC8fFWNx1CMB1cQ-40bIhq8P8xZiW0FYpLxCrvys0FqQ; 1P_JAR=2023-03-0
2-18; NID=511=Lkk-5vkZG-_qldNxsJnyLBmKmFuMEkv3ttzpQA1hvyL4amxJTQL0zEIWD1SmtZ0yDgwjewZP
rm2CV53wE5N4YVR89aOGUZF30oAo1azH8buAD7mKSdPJjnbRp1DTp9epkJXI7I4DLcgtit9UghsBp1JvfrSsJI
EQbe5kedVgUa_a7uLRcMnttvfMBqzDgxbE6d4nrntx4mcFGfq_usgPGeT439CaWQ_RKOQhb1PB1aU2Ht1fSrhW
V0wXfiy4DZJ7m0pUsOxstm-c4qsXk9gkJJoT1gxE_A

origin: https://www.tmh.org

referer: https://www.tmh.org/

sec-ch-ua: "Not_A Brand";v="99", "Google Chrome";v="109", "Chromium";v="109"

sec-ch-ua-mobile: ?0

sec-ch-ua-platform: "Windows"

sec-fetch-dest: empty

*Figures 13 and 14. The screenshot above was captured from the user's network report and depicts what types of information Google received. Notably, the user was executing their search through the Microsoft Edge web browser, not the Google Chrome browser. Stated differently, Google would not have received this information but for Defendant's use of Google's analytics tools.*

101. Accordingly, Google receives patients' communications alongside the patients' IP address, which is also impermissible under HIPAA.

102. Defendant does not disclose that the Pixel embedded in the Source Code for tmh.org tracks and transmits Plaintiff's and Class Members' Private Information to Facebook.

### F. Plaintiff D.S.'s Experiences

103. Plaintiff has been a patient and received medical care at Defendant's facilities since approximately 2014, and she has used the Website for several years.

104. Plaintiff accessed Defendant's Website on her computer and/or mobile device for the purpose of finding and obtaining medical treatment for her specific conditions, which she undertook at Defendant's direction and with Defendant's encouragement.

105. Plaintiff specifically recalls using the Website to search for specialists and treatment related to her neurological condition, and in doing so, she communicated Private Information via the Website concerning her own medical condition(s), medical symptoms, desired treatments, and more via the "Find a Doctor" webpage and other portions of the Website.

106. Plaintiff also used the Website to complete patient web forms, and she used the password-protected patient portal to access her medical records, review

tests results, and communicate Private Information concerning her medical treatment.

107.    During all relevant times, Plaintiff has had an active Facebook account. Shortly after using the Website to search for a neurologist, she began seeing targeted advertisements related to her own medical symptoms, conditions, and the treatments she sought from Defendant via the Website.

108.    Based on the timing and specificity of these targeted advertisements, she believes her Private Information was transmitted to Facebook via Defendant's Website and the Facebook Pixel that Defendant installed onto the Website.

109.    During all relevant times Plaintiff has also had a Google account and believes that the Private Information she communicated via the Website was also transmitted to Google via Defendant's use of Google Analytics on the Website.

110.    The Private Information that Facebook and Google received from Defendant included specific facts concerning her medical condition, was personally identifiable (linked to Plaintiff), and was not anonymized or redacted.

111.    Defendant intercepted and/or facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

112.    As a patient, Plaintiff reasonably expected that her online communications with Defendant via the Website were solely between herself and

Defendant and that Defendant would not transmit her Private Information to Facebook or Google for marketing purposes.

113. But for her status as Defendant's patient, Plaintiff would not have disclosed her Private Information to Defendant or used its Website.

114. When Plaintiff used the Website, her Facebook ID, IP address, device IDs and other personal identifiers were sent to Facebook and Google alongside the substance of her communications.[19]

115. The presence of Facebook advertisements confirms Defendant's unlawful transmission of Plaintiff's Private Information to Facebook.

116. In sum, Defendant's Tracking Tools transmitted Plaintiff's highly sensitive communications and Private Information to Facebook and Google, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

117. By doing so without Plaintiff's consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed Plaintiff's Private Information.

---

[19] After intercepting and collecting this information, Facebook and Google process it, analyze it, and assimilate it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

118.    Upon information and belief, as a "redundant" measure to ensure Plaintiff's Class Members' Private Information was successfully transmitted to third parties like Facebook and Google, Defendant implemented server-based workarounds like Conversions API to send Plaintiff's and Class Members' Private Information from electronic storage on Defendant's server directly to Facebook.

119.    Plaintiff suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendant via the Website.

120.    Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

## G.  Defendant's Conduct Is Unlawful and Violated Industry Norms

### i. Defendant Violated HIPAA Standards

121.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or

household member of a patient for marketing purposes without the patients' express written authorization.[20]

122.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[21]

123.    The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

124.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the

---

[20] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[21]    HHS.gov, HIPAA For Professionals (last visited April 12, 2023), https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html.

past, present, or future payment for the provision of health care to an individual";
and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is
a reasonable basis to believe the information can be used to identify the individual."
45 C.F.R. § 160.103.

125. Under the HIPPA de-identification rule, "health information is not
individually identifiable only if": (1) an expert "determines that the risk is very small
that the information could be used, alone or in combination with other reasonably
available information, by an anticipated recipient to identify an individual who is a
subject of the information" and "documents the methods and results of the analysis
that justify such determination'"; or (2) "the following identifiers of the individual
or of relatives, employers, or household members of the individual are removed;

      a. Names;

      ***

      H. Medical record numbers;

      ***

      J. Account numbers;

      ***

      M. Device identifiers and serial numbers;

      N. Web Universal Resource Locators (URLs);

      O. Internet Protocol (IP) address numbers; … and

      R. Any other unique identifying number, characteristic, or
         code…;and"

> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

126.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

127.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

128.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

129.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

130.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[22]

131.    In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing.

---

[22]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Nov. 3, 2022).

… Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[23]

132.    As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[24]

133.    The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

134.    Defendant's actions violated HIPAA Rules per this Bulletin.

### ii. Defendant Violated Florida Law

135.    Florida law has established policies and procedures for the maintenance, preservation, and storage of patient medical records.

136.    All patient records "are confidential." Fla. Stat. § 395.3025(4). In addition, "Florida law recognizes the confidentiality of a patient's medical record

---

[23]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Nov. 3, 2022)

[24] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

pursuant to the Right of Privacy clause, contained in Article I, Section 23 of the Florida Constitution."

137.    Further, the Florida Patient's Bill of Rights provides that "Every patient who is provided health care services retains certain rights to privacy, which must be respected without regard to the patient's economic status or source of payment for his or her care."

138.    Defendant's actions described herein violated Florida law.

### iii.  Defendant Violated Industry Standards

139.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

140.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

141.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care... Patient privacy encompasses a number of aspects, including, ... personal data (informational privacy)

142.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust,

violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

143.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

## H. Plaintiff's and Class Members' Expectation of Privacy

144.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

145.    Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

## I. IP Addresses Are Personally Identifiable Information

146.    Through the use of the Facebook Pixel on Defendant's Website, Defendant also disclosed and otherwise assisted Facebook with intercepting Plaintiff's and Class Members' Computer IP addresses.

147.    An IP address is a number that identifies the address of a device connected to the Internet.

148.    IP addresses are used to identify and route communications on the Internet.

149.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

150.    Facebook tracks every IP address ever associated with a Facebook user.

151.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

152.    Under HIPAA, an IP address is considered personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See* also, 45 C.F.R. § 164.514(b)(2)(i)(O).

51

153.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**J. Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures**

154.    The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on its platform.

155.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

156.    By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Florida law.

**K. Plaintiff's and Class Members' Private Information Had Financial Value.**

157.    Plaintiff's data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients.

158.    Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, internet companies earned $202 per American user from mining and selling data. That figure is only expected to increase in the future and estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

159.    The value of health data in particular is well-known and has been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar

Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[25]

160.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[26]

161.    Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information.  "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[27]

162.    There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our

---

[25] *See* https://time.com/4588104/medical-data-industry/ (last visited February 16, 2023).

[26] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited March 1, 2023).

increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

163. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

164. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

165. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[28]

## TOLLING

166. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Facebook because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

167.    Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

168.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> **All individuals residing in the United States** who are, or were, patients of Defendant or any of its affiliates, used Defendant's Website, and had their **Private Information disclosed to a third party without authorization or consent as a result of using Defendant's Website.**

169.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

170.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

171.    <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

172. <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g. Whether Defendant violated the consumer protection statutes asserted as claims in this Complaint;

h. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

173. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

174. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

175. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved.

Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

176.     Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

177. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

178. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

179. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

180. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to

refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

181. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

182. Issue Certification, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

  a. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

  b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

  c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

61

d. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

183. Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

## COUNT I
## VIOLATION OF THE FLORIDA SECURITY COMMUNICATIONS ACT
### (On Behalf of Plaintiff and the Class)

184. Plaintiff repeats the allegations contained in paragraphs 1-164 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

185. The Florida Secretary of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, *et seq*. The FSCA begins with legislative findings, including:

On the basis of its own investigations and of published studies, the Legislature makes the following findings…(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.

186.    Florida Statutes § 934.10 provides, in pertinent part, as follows:

Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

187.    The FCSA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

188.    At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook to intercept Plaintiff's and Class Members' internet communications while accessing https://www.tmh.org, including the contents thereof—*i.e.*, the URL visited, the medical conditions and types of doctors searched, whether and with whom the patient had a medical televisit, payment of medical bills, and the contents of any live chats. Such information not only constitutes protected health information, it also represents the substance, import, and meaning of the communications between Plaintiff and other Class Members had with Defendant's Website.

189.    As medical patients, Plaintiff and other Class Members had a reasonable expectation of privacy in the electronic communications they had with Defendant's Website. The application of the Facebook Pixel is not required by law.

190.    Nonetheless, these electronic communications were transmitted to and intercepted by a third party (*i.e.*, Facebook) during the communication and without knowledge, authorization, or consent of Plaintiff and Class Members. That is because Defendant intentionally inserted an electronic device into its website that, without the knowledge and consent of Plaintiff and Class Members, recorded and transmitted the substance of their confidential communications with Defendant to a third party.

191.    Defendant willingly facilitated Facebook's interception and collection of Plaintiff's and Class Members' Private Information by embedding the Facebook Pixel on its Website.

192.    Defendant used the following items as a device or apparatus to intercept wire, electronic, or oral communications made by Plaintiff and other Class Members:

a.  The computer codes and programs Facebook used to track Plaintiff's and Class Members' communications while they were navigating https://www.tmh.org;

b.  Plaintiff's and Class Members' browsers;

c.  Plaintiff's and Class Members' computing and mobile devices;

d.  Facebook's web and ad servers;

e.  The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate https://www.tmh.org;

f.  The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's website; and

g. The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit Defendant's website.

193. Defendant fails to disclose that it is using the Facebook Pixel specifically to track and automatically and simultaneously transmit communications to a third party, *i.e.*, Facebook.

194. To avoid liability under the FCSA, a defendant must show it had the consent of *all* parties to a communication.

195. The patient communication information that Defendant transmits while using the Facebook Pixel, such as doctor appointment booking information and names, IP addresses, and home addresses constitutes protected health information.

196. As demonstrated hereinabove, Defendant violates the FCSA by aiding and permitting third parties to receive its patients' online communications in real time through its Website without their consent.

197. By disclosing Plaintiff's and Class Members' Private Information, Defendant violated Plaintiff's and Class Members' statutorily protected privacy rights.

198. As a result of the above violations and pursuant to Florida Statutes, § 934.10, Plaintiff and Class Members are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

66

199.    Under the statute, Defendant is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## COUNT II
## INVASION OF PRIVACY UNDER FLORIDA CONSTITUION
### (On Behalf of Plaintiff and the Class)

200.    Plaintiff repeats the allegations contained in paragraphs 1-164 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

201.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications, and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

202.    At all relevant times, by using Facebook's Tracking Pixel to record and communicate patients' FIDs and other individually identifying information alongside their confidential medical communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the Florida Constitution.

67

203.    Plaintiff and Class Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Defendant would not install a device or apparatus on www.tmh.org to securely intercept and transmit their electronic communications to a third party.

204.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' Private Information alongside their personally identifiable health information.

205.    This invasion of privacy is serious in nature, scope, and impact because it relates to patients' Private Information. Moreover, it constitutes an egregious breach of the societal norms underlying their privacy rights.

206.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including, but not limited to, an invasion of their privacy rights.

207.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

208.    Plaintiff and Class Members seek appropriate relief for that injury, including, but not limited to, damages that will reasonably compensate Plaintiff and

Class Members for the harm to their privacy interests as a result of Defendant's intrusions upon Plaintiff's and Class Members' privacy.

209.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

210.    Plaintiff also seek other such relief as the Court may deem just and proper.

## COUNT III
## INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

211.    Plaintiff repeats the allegations contained in paragraphs 1-164 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

212.    The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

213.    Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

214.    Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

215.    Defendant's unauthorized disclosure of Plaintiff's and Class Members' Private Information to Facebook, a third-party social media and marketing giant, is highly offensive to a reasonable person.

216.    Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

217.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

218.    Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Pixel onto its Website because

the purpose of the Pixel is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

219. Because Defendant intentionally and willfully incorporated the Facebook Pixel into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

220. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and the Class Members was disclosed to a third party without authorization, causing Plaintiff and the Class to suffer damages.

221. Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

222. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information are still maintained by Defendant and still in the possession of Facebook and the wrongful disclosure of the information cannot be undone.

223. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's

disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

224. Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(on behalf of Plaintiff and the Class)**

225. Plaintiff repeats the allegations contained in paragraphs 1-164 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

226. As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiffs and the Class provided their Private Information and compensation for their medical care.

227. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

228. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

229.    Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information without consent to third parties like Facebook.

230.    As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

231.    Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## COUNT V
## UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Class)

232.    Plaintiff repeats the allegations contained in paragraphs 1-164 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

233.    Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

234.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously

collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

235.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

236.    The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Florida and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

237.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VI
### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
### 18 U.S.C. § 2511(1) *et seq.*
### UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE
#### (On Behalf of Plaintiff and the Class)

238.    Plaintiff repeats the allegations contained in paragraphs 1-164 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

239.    The ECPA protects both sending and receipt of communications.

240.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

241.    The transmissions of Plaintiff's Private Information to Defendant via Defendant' Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

242.    The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

243.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a  wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate

75

commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

244.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

245.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

246.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendant's webservers; and

    d.  The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

247.   By utilizing and embedding the Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

248.   Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Facebook.

249.   Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

250.   By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

251.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

252.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, violation of the FCSA, invasion of privacy, among others.

253.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel and Conversions API to track and utilize Plaintiff's and Class Members' Private Information for financial gain.

254.    Defendant was not acting under color of law to intercept Plaintiff and the Class Member's wire or electronic communication.

255.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel tracking code.

256.    Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

257.    In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious and designed to violate federal and state legal provisions, including as described above the following: (1) violating the FSCA; and

(2) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

## COUNT VII
## BREACH OF CONFIDENCE
### (On behalf of Plaintiff and the Class)

258.    Plaintiff repeats the allegations contained in paragraphs 1-164 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

259.    Medical providers have a duty to their patients to keep non-public medical information completely confidential.

260.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged via Defendant's Website.

261.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

262.    These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

263.    The third-party recipients included, but may not be limited to, Facebook.

264.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

265.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

    a.  Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

    b.  Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c.  Defendant eroded the essential confidential nature of the provider-patient relationship;

    d.  General damages for invasion of their rights in an amount to be determined by a jury;

    e.  Nominal damages for each independent violation;

    f.  Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class members have in their Private Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.    For an award of damages, including, but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

DATE: December 29, 2023                    Respectfully Submitted,

_/s/ Scott C. Harris_
Scott C. Harris
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLCR**
900 W. Morgan Street
Raleigh, NC  27603
Telephone:  (919) 600-5003
sharris@milberg.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
_gklinger@milberg.com_

Glen L. Abramson*
Alexandra M. Honeycutt*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN  37929
Telephone: (866) 252-0878
*gabramson@milberg.com*
*ahoneycutt@milberg.com*

Bryan L. Bleichner*
Philip J. Krzeski*
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Phone: (612) 339-7300/Fax: (612) 336-2940
*bbleichner@chestnutcambronne.com*
*pkrzeski@chestnutcambronne.com*

Terence R. Coates*
Dylan J. Gould*
**MARKOVITS, STOCK & DEMARCO,
LLC**
119 E. Court St., Ste. 530
Cincinnati, Ohio 4502
Phone: (513) 651-3700/Fax: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Joseph M. Lyon*
**THE LYON LAW FIRM**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333/Fax: (513) 766-9011
*jlyon@thelyonfirm.com*

***Counsel for Plaintiff and the Putative
Class***

\* *pro hac vice* forthcoming

83